IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LISA D. RUSHTON,<br><br>    Plaintiff,<br><br><br><br><br>        vs.<br><br><br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security,<br><br>        Defendant. | MEMORANDUM DECISION AND<br>ORDER ON ADMINISTRATIVE<br>APPEAL<br><br><br><br><br>Case No. 2:11-CV-777 TS |

This matter comes before the Court on Plaintiff Lisa D. Rushton's appeal from the

decision of the Social Security Administration denying her application for disability insurance

benefits.  Having considered the arguments set forth by the parties, reviewed the factual record,

relevant case law, and being otherwise fully informed, the Court will affirm the administrative

ruling, as discussed below.

## I.  STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited to determining whether the findings are supported by substantial evidence and whether the correct legal standards were applied.[1] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  The ALJ is required to consider all of the evidence, although he or she is not required to discuss all of the evidence.[3]  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4]

The Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[5]  However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the ALJ's.[6]

## II.  BACKGROUND

A.    PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on October 29, 2007, alleging disability as of March 2006.[7]  Plaintiff's application was denied initially and on

---

[1]*Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[2]*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[3]*Id*.

[4]*Richardson v. Perales*, 402 U.S. 389, 402 (1981).

[5]*Shepard v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6]*Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

[7]R. at 120-22.

reconsideration.[8]  Plaintiff requested a hearing before an administrative law judge ("ALJ"),

which was held on January 13, 2009.[9]  The ALJ issued his decision finding Plaintiff not disabled

on May 7, 2009.[10]  The Appeals Council subsequently denied Plaintiff's request for review,[11]

making the ALJ's decision the Commissioner's final administrative decision for purposes of

judicial review.

B.      MEDICAL HISTORY

Plaintiff injured her back in March 2006, when lifting boxes at work.[12]  Plaintiff

experienced pain going down both legs, but no numbness or tingling.[13]  Plaintiff's doctor applied

manual therapy to her lumbar spine with "good results" and prescribed pain medication.[14]

A few days later, Plaintiff presented to the emergency room complaining of significant

back pain.[15]  Plaintiff was prescribed pain medication and released and was scheduled for an

MRI.[16]  Plaintiff visited Millcreek Imaging Center on March 20, 2006, where an MRI was

_____

[8]*Id.* at 82-83.

[9]*Id.* at 21-81.

[10]*Id.* at 12-20.

[11]*Id.* at 1-4.

[12]*Id.* at 357.

[13]*Id.*

[14]*Id.*

[15]*Id.* at 208-12.

[16]*Id.*

performed.[17]   The MRI was largely unremarkable except for a "tiny tear" at one vertebrae level

with no nerve root impingement.[18]

Plaintiff began treatment with Dr. Kade Huntsman in April 2006.[19]   Plaintiff presented

with complaints of severe back pain occasionally radiating into the leg.[20]   Plaintiff stated that

"100% of her problem is the back."[21]   X-rays of the lumbar spine showed some mild

degenerative changes.[22]   An MRI showed degenerative changes and an annular tear.[23]   Dr.

Huntsman recommended a discogram as well as a CT scan.[24]

Plaintiff's discogram was a "bit unusual."[25]   Though Plaintiff had minimal pain at the

L4/5 level, the scan found it "much more degenerative."[26]   Meanwhile, Plaintiff complained of

the most pain at the L3/4, but the scan revealed "this level is quite healthy with just a small cleft

proceeding anteriorly."[27]

---

[17]*Id*. at 303.

[18]*Id*.

[19]*Id*. at 237.

[20]*Id*.

[21]*Id*.

[22]*Id*. at 238.

[23]*Id*.

[24]*Id*. at 239.

[25]*Id*. at 236.

[26]*Id*.

[27]*Id*.

Plaintiff again presented to the emergency room on April 18, 2006, complaining of neck pain related to an earlier car accident.[28]  An x-ray showed degenerative joint disease at C5-6, but was otherwise negative.[29]  Plaintiff was prescribed pain medication and was directed to attend physical therapy.[30]

In May 2006, Plaintiff saw Scot W. Russell, Ph.D., who conducted a Psychological Pre-Surgical Screening Evaluation.[31]  After examining Plaintiff, Dr. Russell found a low to medium risk of a poor outcome from surgery from a psychological standpoint.[32]  Dr. Russell found the psychological prognosis to be fair and cleared Plaintiff for surgery.[33]

Plaintiff was examined by Warren Stadler, M.D. in July 2006 in relation to her worker's compensation claim.[34]  Dr. Stadler reviewed Plaintiff's medical records and conducted a physical examination of Plaintiff.  The examination revealed full range of motion in Plaintiffs hip and knee joints, as well as her upper and lower extremities.[35]  In addition, Plaintiff had a stable

---

[28]*Id*. at 205.

[29]*Id*. at 206.

[30]*Id*.

[31]*Id*. at 197-202.  Dr. Hunstman had earlier referred Plaintiff to Dr. Russell.  *See id*. at 236.

[32]*Id*. at 201.

[33]*Id*.

[34]*Id*. at 263-67.

[35]*Id*. at 264.

neurological examination.[36]  Dr. Stadler opined that Plaintiff was medically stable, that no further treatment was medically necessary, that Plaintiff was at maximum medical improvement, and could return to work.[37]

Plaintiff returned to see Dr. Huntsman in August 2006.  At that time, Dr. Huntsman made the decision to perform a three-level lumbar discectomy and fusion.[38]  Plaintiff underwent the fusion surgery on August 22, 2006.[39]  Dr. Huntsman estimated that Plaintiff could require six to twelve weeks to recover from the surgery.[40]

Several days after the surgery Plaintiff presented to the emergency room complaining of back pain.[41]  Plaintiff was administered pain medication and was permitted to return home.[42]

Plaintiff then saw Dr. Huntsman for a follow-up visit about two weeks after her surgery.[43]  Plaintiff was "doing very well" and her "x-rays look[ed] excellent."[44]  There was no evidence of infection and Plaintiff was started on a regimen of physical therapy.[45]

---

[36]*Id*. at 265.

[37]*Id*. at 265-66.

[38]*Id*. at 234.

[39]*Id*. at 304-06.

[40]*Id*. at 268.

[41]*Id*. at 203-04.

[42]*Id*.

[43]*Id*. at 232.

[44]*Id*.

[45]*Id*.

Plaintiff again followed-up with Dr. Huntsman in October 2006.[46]  Plaintiff complained of "persistent left buttock pain that radiates down the posterior aspect of the thigh and anterior aspect of the thigh."[47]  Dr. Huntsman prescribed pain medication and discussed the possibility of a selective nerve root block if the pain persisted.[48]  Later that month, Dr. Huntsman indicated that Plaintiff had been calling the office on a daily basis.[49]  Dr. Huntsman noted that Plaintiff's back pain had significantly improved, but she was experiencing leg pain.[50]  Dr. Huntsman was concerned that there may be some irritation of the nerve and indicated that a possible selective nerve root block may be necessary.[51]  Dr. Huntsman also increased Plaintiff's pain medication.[52]

In late October 2006, Plaintiff was seen by Joel T. Dall, M.D. for an independent medical evaluation.[53]  During the examination, Plaintiff reported that her back pain had decreased post-operatively, but that her leg pain had increased.[54]  After reviewing her records and conducting a physical examination of Plaintiff, Dr. Dall opined that Plaintiff was not capable of returning to

---

[46]*Id.* at 231.

[47]*Id.*

[48]*Id.*

[49]*Id.* at 229-30.

[50]*Id.*

[51]*Id.* at 229.

[52]*Id.*

[53]*Id.* at 216-26.

[54]*Id.* at 217.

full-time work at that time because of her fusion surgery.[55]  Dr. Dall stated that Plaintiff had not reached maximal medical improvement and would not likely do so until at least six months following her surgery or possibly longer.[56]

Plaintiff "was feeling that she was not getting enough action taken to satisfy her" from Dr. Huntsman, so she saw David M. Witter, M.D. in November 2006.[57]  Dr. Witter prescribed pain medication but advised Plaintiff to return to Dr. Huntsman to clarify that her pain was getting worse.[58]

Plaintiff saw Dr. Arun Rajagopal for evaluation and management of pain in November 2006.[59]  Dr. Rajagopal also performed a selective nerve root block upon the request of Dr. Huntsman.[60]  Following the procedure, Plaintiff reported relief of 50% for approximately two weeks and only slight improvement thereafter.[61]  Dr. Huntsman later noted that the nerve root block did not provide any relief because "[t]hey were unable to get the injection into the appropriate place."[62]

---

[55]*Id*. at 224.

[56]*Id*.

[57]*Id*. at 348-50.

[58]*Id*. at 349.

[59]*Id*. at 241.

[60]*Id*.

[61]*Id*. at 476.

[62]*Id*. at 228.

Plaintiff again saw Dr. Huntsman for a follow-up visit on November 13, 2006.[63]  Plaintiff indicated that she was "doing well in terms of her back pain" but was "doing very poorly in terms of her left leg."[64]  On that same date, Dr. Huntsman completed a form indicating that Plaintiff could work 40 hours per week at a sit down job.[65]

Plaintiff returned to see Dr. Huntsman on November 30, 2006.  Dr. Huntsman indicated that Plaintiff's back pain had greatly improved and that her leg pain had centralized.[66]  Dr. Huntsman stated that because of this "sudden significant improvement" further treatment was not required.[67]  Plaintiff required much less medication and was referred to a pain clinic.[68]  Dr. Huntsman indicated that Plaintiff would be seen as needed.[69]

Dr. Dall provided a letter on January 17, 2007, providing updated information about Plaintiff's condition.[70]  Dr. Dall stated that he had contacted Dr. Huntsman's office for an update.[71]  That office indicated that they received a phone call from Plaintiff six to eight weeks

_____

[63]*Id.*

[64]*Id.*

[65]*Id.* at 244.

[66]*Id.* at 227.

[67]*Id.*

[68]*Id.*

[69]*Id.*

[70]*Id.* at 214-15.

[71]*Id.* at 214.

prior "indicating that her pain is 'gone.'"[72]  In further discussions with Dr. Huntsman's office,

Plaintiff continued to do well.[73]

Plaintiff continued to see Dr. Rajagopal over the next several months.  Plaintiff received a

spinal cord simulator trial and reported that it "worked very well."[74]  She reported that "it was a

pleasant surprise to wake up in the morning and not have pain in her legs and back."[75]  As a

result of this, Plaintiff had a spinal cord stimulator surgically implanted in her spine.[76]  A few

days after that surgery, Plaintiff reported that the pain had improved with the spinal cord

simulator.[77]  About a month later, Plaintiff stated that the stimulator was providing fair relief.[78]

On July 10, 2007, Plaintiff reported to David Nelson, D.O. that she was starting to have

depression and anxiety symptoms.[79]  Plaintiff was prescribed Celexa for her depression.[80]  On

later visits, Plaintiff indicated that her depression was well controlled on Celexa and that she was

happy with that treatment.[81]

_____

[72]*Id.*

[73]*Id.*

[74]*Id.* at 482.

[75]*Id.*

[76]*Id.* at 327-35, 409-22.

[77]*Id.* at 483.

[78]*Id.* at 485.

[79]*Id.* at 344.

[80]*Id.* at 345.

[81]*Id.* at 340, 342.

In December 2007, David O. Peterson, M.D., a state agency physician, reviewed Plaintiff's medical records and opined that she was capable of light work.[82]  Dennis Taggart, M.D., another state agency physician also reviewed Plaintiff's records and agreed with Dr. Peterson's conclusions.[83]

Also in December 2007, a state agency psychologist reviewed the records and opined that Plaintiff's condition appeared nonsevere.[84]  A Psychiatric Review Technique form found that Plaintiff had only mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence, or pace.[85]  No difficulties in maintaining social functioning and no episodes of decompensation were found.[86]  Another state agency psychologist reviewed this assessment and concurred with the earlier opinion.[87]

In January 2008, Plaintiff was referred to Richard Kendall, D.O. "for consultation regarding chronic low back pain."[88]  On examination, Plaintiff's range of motion was limited by pain in the low back.[89]  However, Plaintiff's gait and balance were intact and she had normal

---

[82]*Id.* at 363.

[83]*Id.* at 391.

[84]*Id.* at 364.

[85]*Id.* at 375.

[86]*Id.*

[87]*Id.* at 390.

[88]*Id.* at 405-07.

[89]*Id.* at 406.

strength throughout her lower limbs.[90]  In addition, stress and straight-leg testing was negative.[91]

Dr. Kendall opined that the likely greatest contributor to her pain was left hip joint dysfunction.[92]

Dr. Kendall referred Plaintiff to physical therapy "to address core and gluteal strengthening as

well as hip external rotator stretching in hopes of relieving her symptoms."[93]  Dr. Kendall also

advised that she follow up in four to six weeks to assess her progress and consider a hip

injection.[94]

 Plaintiff attended an appointment at Utah Pain Specialists on April 10, 2008, where it was

noted that the spinal cord stimulator was providing "fair relief."[95]  Plaintiff reported her mood

quality as "good with some associated depression."[96]

 Plaintiff again went to Utah Pain Specialists in October 2008 to see Dr. Rajagopal.[97]  At

that time, Plaintiff received a steroid injection in her spine due to neck pain.[98]  At a follow-up

visit in November 2008, Plaintiff's neck pain was stable and the previous injection had provided

---

[90]*Id.*

[91]*Id.*

[92]*Id.* at 407.

[93]*Id.*

[94]*Id.*

[95]*Id.* at 486.

[96]*Id.*

[97]*Id.* at 463.

[98]*Id.*

90% relief, but she was having pain in her left hip.[99]  An injection in the hip was administered a few days later.[100]  In December 2008, Plaintiff returned for a follow-up visit indicating that her neck pain was manageable and that her hip pain improved 80%.[101]  Plaintiff continued to have back pain.[102]

Later in December 2008, Plaintiff presented to Dr. Nelson stating that she did not feel like Celexa was fully controlling her depression and anxiety.[103]  As a result, Dr. Nelson increased Plaintiff's Celexa dosage.[104]

C.    HEARING TESTIMONY

The ALJ conducted a hearing on January 13, 2009, where Plaintiff, a medical expert, and a vocational expert provided testimony.

At the hearing, Plaintiff claimed the following physical and mental impairments: low back pain, asthma, bursitis, depression, and anxiety.[105]  Plaintiff stated that her lower back was

---

[99]*Id*. at 465.

[100]*Id*. at 467.

[101]*Id*. at 469.

[102]*Id*.

[103]*Id*. at 491.

[104]*Id*. at 492.

[105]*Id*. at 32-33.

13

the worst of these impairments, followed by her hips and leg.[106]  Plaintiff testified that her pain required her to walk slowly and that she had issues keeping her balance.[107]

Plaintiff testified that it would be difficult for her to return to one of her previous jobs because of the walking and sitting involved in that job.[108]  Plaintiff stated that she could work as a hotel desk clerk, so long as there was not a lot of walking and she would be able to sit down and rotate every so often.[109]  Plaintiff later testified that she could sit for about 15 minutes until the pain required her to stand, which she could do for about 15 minutes before needing to sit or lay down.[110]

Plaintiff testified about her back surgery, indicating that it helped her "in certain areas" and that it was better than it was before.[111]  However, Plaintiff also stated that her symptoms had started getting worse.[112]  Plaintiff also stated that she attended physical therapy following her

---

[106]*Id*. at 44.

[107]*Id*. at 58-59.

[108]*Id*. at 43.

[109]*Id*. at 43-44.

[110]*Id*. at 60.

[111]*Id*. at 45.

[112]*Id*.

surgery, but it did not resolve her issues with low back and leg pain.[113]  Plaintiff stated that the

spinal cord simulator provided some relief in the beginning, but slowly stopped helping.[114]

Plaintiff further testified that she took Celexa for depression.[115]  Plaintiff stated that the

Celexa helped, but did not completely resolve her symptoms.[116]

A medical expert provided testimony concerning Plaintiff's mental impairments.  The

medical expert testified that there were no treatment records for 12 months or longer from any

treating source on a mental disorder.[117]  As a result, there were insufficient records to evaluate

whether Plaintiff met the criteria for Listings 12.04 and 12.06.[118]  However, the medical expert

testified that if there were records that Plaintiff continued to be in stressful levels of pain from

the time of her surgery to the present, that there would be sufficient evidence for a diagnosis of

depression, secondary to chronic pain.[119]

Next, the ALJ heard the testimony of the vocational expert.  In response to the ALJ's

hypothetical, the vocational expert testified that such a person could perform light and sedentary

---

[113]*Id.* at 50.

[114]*Id.* at 52.

[115]*Id.* at 54.

[116]*Id.* at 56-57.

[117]*Id.* at 69.

[118]*Id.*

[119]*Id.* at 70.

work, and could perform the jobs of a dental hygienist, cashier, assembler, and office manager.[120]

The vocational expert identified the office manager as the easiest of these jobs to perform

because it involved sedentary work.[121]

D.      THE ALJ'S DECISION

        The ALJ issued his decision on May 7, 2009.[122]  The ALJ followed the five-step

sequential evaluation process in deciding Plaintiff's claim.  At step one, the ALJ determined that

Plaintiff had not engaged in substantial gainful activity since March 11, 2006.[123]  At step two, the

ALJ found that Plaintiff had the following severe impairments: disorder of the low back, asthma,

and bursitis.[124]  At step three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that met or equaled a listed impairment.[125]  After determining

Plaintiff's residual functional capacity,[126] the ALJ found that Plaintiff was capable of performing

---

[120]*Id*. at 76.

[121]*Id*. at 76-77.

[122]*Id*. at 12-20.

[123]*Id*. at 14.

[124]*Id*. at 14-15.

[125]*Id*. at 15.

[126]*Id*. at 15-19.

her past relevant work as a cashier, assembler, and office manager.[127]   Therefore, the ALJ found that Plaintiff was not disabled.[128]

### III.  DISCUSSION

Plaintiff raises the following arguments in her brief: (1) the ALJ erred in finding that her depression was not a severe impairment; (2) the ALJ erred in finding that her condition did not meet or medically equal a listed impairment; (3) the ALJ improperly discounted her credibility and improperly assessed her residual functional capacity; and (4) the ALJ failed to pose a complete hypothetical to the vocational expert.

### A.    STEP TWO DETERMINATION

Plaintiff's first argument is that the ALJ failed to consider all of her severe impairments. Specifically, Plaintiff argues that the ALJ erred in failing to find that her depression, secondary to chronic pain, was a severe disorder.

At step two of the five-step sequential evaluation process, the ALJ considers whether the claimant has an impairment or combination of impairments that is severe.[129]   An impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities.[130]

---

[127]*Id.*

[128]*Id.* at 19-20.

[129]20 C.F.R. § 404.1520(a)(4)(ii).

[130]*Id.* § 404.1521.

In this case, the ALJ found that Plaintiff had the following severe impairments: disorder of the low back, asthma, and bursitis.  The ALJ, however, did not find that Plaintiff's depression was a severe impairment noting that it did "not meet the 12-month duration requirement for severe impairment."[131]  Plaintiff argues that this was error.

Generally, an error at step two is harmless when, as here, the ALJ finds another impairment is severe and proceeds to the remaining steps of the evaluation.[132]  Though Plaintiff argues that the ALJ erred at step two, she has failed to demonstrate how this alleged error affects her case.  The ALJ found severe impairments at step two and continued to addressed the sequential process.  Under the regulations, the ALJ is required to consider all of Plaintiff's impairments, including those that are not severe.[133]  As will be discussed below, the ALJ considered Plaintiff's mental impairments in determining the residual functional capacity.  As a result, any error in failing to find Plaintiff's depression to be a severe impairment was harmless and does not necessitate reversal.

B.   STEP THREE DETERMINATION

Plaintiff also argues that the ALJ erred at his step three determination.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  The ALJ specifically considered Listing 1.04.

---

[131]R. at 15.

[132]*See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008).

[133]20 C.F.R. § 404.1545.

Listing 1.04A requires that Plaintiff show a disorder of the spine resulting in compromise of a nerve root or spinal cord with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).[134]

The ALJ found as follows:

> The MRI evidence does not establish nerve impingement.  Post surgical examination on 1/15/2008 showed negative straight leg raising test, and the claimant denied numbness, tingling, weakness, or problems with gait or coordination.  She therefore does not meet the criteria of listing 1.04 for spinal injuries.[135]

Plaintiff takes issue with the ALJ's finding at step three, stating that it is "inaccurate and confusing."[136]  Plaintiff, however, points to nothing in the record to demonstrate evidence of nerve root compression.  Indeed, the record demonstrates an absence of nerve root compression.[137]  Thus, despite Plaintiff's other arguments, it is clear that she did not meet Listing 1.04A.  Therefore, the ALJ's finding in this regard is supported by substantial evidence.

Plaintiff further argues that her condition medically equaled Listing 1.04.  However, this statement is conclusory and Plaintiff provides an insufficient basis to evaluate this argument.  As Plaintiff bears the burden of proof on this issue, this argument must be rejected.

---

[134]20 C.F.R. pt. 404, subpt. P, app. 1, Listing 1.04A.

[135]R. at 15 (citation omitted).

[136]Docket No. 13, at 13.

[137]*See* R. at 303, 227, 325, 451, and 402.

C.      RESIDUAL FUNCTIONAL CAPACITY AND CREDIBILITY

Plaintiff makes two primary arguments concerning the ALJ's determination of her residual functional capacity.  First, Plaintiff argues that the ALJ improperly determined her residual functional capacity.  Second, she argues that the ALJ erred in his credibility determination and failed to develop the record.  These arguments will be discussed below.

1.      *Residual Functional Capacity*

Plaintiff argues that the ALJ failed to properly determine her residual functional capacity. In particular, Plaintiff states that the ALJ failed to take into account her instability and inability to ambulate effectively.  Plaintiff also argues that the ALJ's limitations did not adequately take into account her depression, secondary to chronic pain.  Finally, Plaintiff argues that the ALJ improperly rejected the opinion of Dr. Dall.

A residual functional capacity assessment is based on all of the relevant evidence in the record, including: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available.[138]  "The adjudicator must consider all allegations of physical and mental limitations

---

[138]SSR 96-8, 1996 WL 374187, at *5.

or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess" the residual functional capacity.[139]

The ALJ determined that Plaintiff had the residual functional capacity to perform light work

> except occasionally she can walk, climb stairs, squat, bend or stoop, kneel, reach above the shoulders, push or pull, and use foot controls; she can frequently turn her arms and wrists, open and close her fists, and use her hands and fingers; she is not limited in balancing; she has normal grip strength and fine and manual dexterity in both hands; she has mild limitations in the ability to concentrate and to interact with the public; she has mild to moderate limitation in the ability to perform duties within a schedule and to deal with work production; and moderate limitation in  ability to deal with stress; she is not limited in other work-related functions; in summary she is not significantly limited in understanding or memory, concentration or persistence, social interaction, or adaptation; she has normal vision and hearing and can tolerate normal air pollutants and temperature settings.[140]

As stated, Plaintiff argues that this residual functional capacity assessment failed to take into account her instability and inability to ambulate effectively.  These limitations come from Plaintiff's testimony at the administrative hearing.[141]  However, as discussed below, the ALJ was not required to accept Plaintiff's testimony and the ALJ's credibility determination is supported by substantial evidence.  Therefore, the Court must reject this argument.

Plaintiff also takes issue with the ALJ's determination of Plaintiff's mental residual functional capacity.  In particular, Plaintiff states that the medical evidence "supports a finding of

---

[139]*Id.*

[140]R. at 15.

[141]*Id.* at 58-61.

depression, secondary to chronic pain" and "also substantiates Plaintiff's limitations as to her function."[142]

The evidence related to Plaintiff's mental impairments is extremely limited.  In May 2006, Dr. Russell conducted a Psychological Pre-Surgical Screening Evaluation of Plaintiff.[143] Dr. Russell found a low to medium risk of a poor outcome from surgery from a psychological standpoint and cleared her for surgery.[144]  In July 2007, Plaintiff reported depression and anxiety symptoms.[145]  Plaintiff was prescribed Celexa for her depression.[146]  On later visits, Plaintiff indicated that her depression was well controlled on Celexa and that she was happy with that treatment.[147]  In December 2008, Plaintiff stated that she did not feel like Celexa was fully controlling her depression and anxiety and her dosage was increased.[148]

The ALJ, in assessing Plaintiff's residual functional capacity noted these mental health issues and found certain limitations in Plaintiff's ability to concentrate and interact with the public, perform duties within a schedule and deal with work production, and deal with stress. Though Plaintiff argues that the ALJ's residual functional capacity finding is inconsistent with

---

[142]Docket No. 13, at 9.

[143]R. at 197-202.

[144]*Id*. at 201.

[145]*Id*. at 344.

[146]*Id*. at 345.

[147]*Id*. at 340, 342.

[148]*Id*. at 491-92.

the record, she does not explain how.  As a result, the Court cannot find that the ALJ erred in his assessment of Plaintiff's mental residual functional capacity.

Plaintiff also argues that the ALJ erred in rejecting the opinion of Dr. Joel Dall, M.D.  On October 26, 2006, Dr. Dall opined that Plaintiff was "significantly limited" and "not able to return to anything more than sedentary work with the ability to change positions frequently."[149] However, it must be recognized that Dr. Dall's assessment was based on the fact that Plaintiff recently had surgery and had "not reached maximal medical improvement."[150]  Dr. Dall's report seems to indicate that Plaintiff's condition after surgery would improve after time.  Indeed, Dr. Dall later reported that Plaintiff indicated that her pain was gone and that "she continues to do well."[151]  To the extent that Dr. Dall was opining that Plaintiff would never be able to return to full time work, this opinion is not supported by the record.  Thus, the Court can find no error in the ALJ's treatment of Dr. Dall.

2.    *Credibility*

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment."[152]

---

[149]*Id*. at 224.

[150]*Id*.

[151]*Id*. at 214.

[152]*Id*. at 16.

"Credibility determinations are peculiarly the province of the finder of fact" and will not be upset "when supported by substantial evidence."[153]  "However, [f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[154]

In this case, the Court finds that the ALJ's credibility determination is supported by substantial evidence.  As stated, the ALJ found that Plaintiff's impairments could be expected to cause the symptoms alleged, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not wholly credible.  A review of the record supports this finding.  While the record certainly discloses some impairment, the record does not support Plaintiff's testimony concerning the limiting effects of those impairments.  As a result, the Court must reject this argument.

Plaintiff also argues that the ALJ was required to developed the evidentiary record and should have sought additional information.  While it is true that an ALJ is under an obligation to develop the record,[155] Plaintiff has failed to point to anything suggesting the record here was inadequate.  Indeed, at the close of the administrative hearing the ALJ left the record open so that Plaintiff could supply additional documents which have since become part of the record.[156]

---

[153]*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation marks and citation omitted).

[154]*Id*. (quotation marks and citation omitted).

[155]*Carter v. Chater*, 73 P.3d 1019, 1022 (10th Cir. 1996) ("An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing.").

[156]R. at 31-32.

Therefore, the Court cannot find that the ALJ failed to adequately develop the record in this matter.

D.     VOCATIONAL EXPERT

Plaintiff's final contention is that the ALJ failed to pose a complete hypothetical to the vocational expert.  Plaintiff argues that the hypothetical did not comprehensively describe Plaintiff's functional limitations "because it failed to consider the effects of . . . how long she could tolerate sitting, her depression, secondary to chronic pain, her insomnia and the effects of her narcotic medication."[157]

The ALJ was required to include all impairments borne out by the evidentiary record in his hypothetical to the vocational expert.[158]  However, the hypothetical must contain only those impairments and need not include "limitations claimed by plaintiff but not accepted by the ALJ as supported by the record."[159]  For the reasons set forth above, the Court finds there is substantial evidence in the record upon which the ALJ could reject the limitations claimed by Plaintiff.  Therefore, these limitations need not be included in the hypothetical given to the vocational expert and the ALJ did not err in not including them in the hypothetical.

## IV.  CONCLUSION

Having made a thorough review of the entire record, the Court finds that the ALJ's evaluation and ruling is supported by substantial evidence.  Therefore, the Commissioner's

---

[157]Docket No. 13, at 15.

[158]*Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995).

[159]*Id.*

findings must be affirmed.  Further, the Court finds that the ALJ applied the correct legal

standard in determining that Plaintiff did not have a disability within the parameters of 20 C.F.R.

§ 404.1520 (a)-(f).

For the reasons just stated, the Court hereby AFFIRMS the decision below.  The Clerk of

the Court is directed to close this case forthwith.

DATED   July 6, 2012.

BY THE COURT:

_____

TED STEWART
United States District Judge

26